Peter J. Richardson (OSB No. 066687)
Gregory M. Adams (OSB No. 101779)
Richardson Adams, PLLC
515 N. 27th Street
Boise, Idaho 83702
Telephone: (208) 938-2236
Fax: (208) 938-7904
peter@richardsonadams.com
greg@richardsonadams.com

John Rizzardi (OSB No. 092144)
Cairncross & Hempelmann
524 Second Ave., Ste. 500
Seattle, Washington 98104-2323
Telephone: 206-254-4444
Fax: 206-587-2308
jrizzardi@cairncross.com

Attorneys for Plaintiff PáTu Wind Farm, LLC

## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **PÁTU WIND FARM, LLC,** | Case No.: 15-1373 |
| Plaintiff, | COMPLAINT |
| v. | DEMAND FOR JURY TRIAL |
| **PORTLAND GENERAL ELECTRIC COMPANY,** | |
| Defendant. | |

## I.   SUMMARY

1.     This action arises from a contract for the sale of electricity at wholesale from Plaintiff

Page 1 – Plaintiff's Complaint
{02859075.DOCX;1 }

PáTu Wind Farm, LLC's ("PáTu") wind generation facility to Portland General Electric Company ("PGE" or "Portland General") and PGE's refusal to accept deliveries of PáTu's entire net electrical output (referred to as "net output").  Instead of accepting PáTu's net output, which is measured at the plant's meter in kilowatt hours ("kWh"), PGE has refused to accept any deliveries other than megawatt-hour block ("MWh-block") deliveries, which provide PGE with the additional benefits of wind integration services at PáTu's expense.

2.      PáTu filed a complaint with the Federal Energy Regulatory Commission ("FERC") alleging that PGE had violated the Federal Power Act ("FPA") in refusing to accept PáTu's net output.  FERC granted PáTu's FPA Complaint, in part, by rejecting as unlawful PGE's practice of accepting only prescheduled MWh-block deliveries and ordered PGE to accept PáTu's entire net output, including unscheduled net output.  *PáTu Wind Farm, LLC v. Portland General Electric Co.*, 150 FERC ¶ 61,032 (Jan. 22, 2015), *reh'g denied* 151 FERC ¶ 61,223 (June 18, 2015).  FERC also ruled that PáTu could seek damages in a court of competent jurisdiction. PáTu brings this action to enforce FERC's orders, pursuant to 16 U.S.C. § 825p, and to bring related claims for statutory and contractual damages arising from the liability determined in FERC's orders.

## II.      JURISDICTION AND VENUE

3.      This action arises under a federal statute, Section 317 of the Federal Power Act, 16 U.S.C. § 825p, which provides, in pertinent part: "The District Courts of the United States ... shall have exclusive jurisdiction of violations of this chapter or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder."

16 U.S.C. § 825p.  Thus, Section 317 of the Federal Power Act grants this Court jurisdiction to enforce FERC's orders.

4.      Independently, jurisdiction arises under a second federal statute, the Public Utility Regulatory Policies Act of 1978 ("PURPA"), 16 U.S.C. § 824a-3 *et seq.*  Section 210(a) of PURPA requires FERC to prescribe rules as it determines necessary to require electric utilities to purchase electric energy from cogeneration and small power production facilities, such as PáTu's wind generation facility.  16 U.S.C. § 824a-3(a)(2).  Section 210(h)(1) of PURPA further provides: "For purposes of enforcement of any rule prescribed by the Commission under subsection (a) of this section with respect to any operations of an electric utility . . . which are subject to the jurisdiction of the Commission under part II of the Federal Power Act, such rule shall be treated as a rule under the Federal Power Act."  16 U.S.C. § 824a-3(h)(1).  In turn, Part II of the Federal Power Act provides FERC with jurisdiction to regulate the operations of electric utilities with respect to interstate transmission of electricity.  *See* 16 U.S.C. § 824e *et seq.* Thus, Section 317 of the Federal Power Act, 16 U.S.C. § 825p, provides this Court with jurisdiction to enforce FERC's rules prescribed under Section 210(a) of PURPA with respect to PGE's operations subject to FERC's jurisdiction over interstate transmission of electricity.

5.      Accordingly, this Court has jurisdiction over each claim for relief pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, 28 U.S.C. § 1367, and/or 28 U.S.C. § 2201.

6.      Venue in the Oregon District and the Portland Division is proper because PGE is located in this district, and a substantial part of the events and omissions giving rise to the claims occurred in this district.

### III.    THE PARTIES

Page 3 – Plaintiff's Complaint
{02859075.DOCX;1 }

7.     PáTu Wind Farm, LLC is a Delaware limited liability company, with its principal place of business located at 71190 North Klondike Road, Wasco, Oregon 97065.  PáTu's only wind farm is a self-certified qualifying facility ("QF") pursuant to PURPA and FERC's regulations implementing PURPA, 18 C.F.R. pt. 292 *et seq.*

8.     Portland General Electric Company is an Oregon corporation with its principal place of business at 121 Southwest Salmon Street, Portland, Oregon 97204.  PGE is a regulated, vertically-integrated, investor-owned electric utility providing electric service in the State of Oregon.  PGE is subject to the regulatory authority of FERC and the Public Utility Commission of Oregon ("OPUC").

## IV.     THE STATUTORY AND REGULATORY FRAMEWORK

9.     This dispute relates to PáTu's contractual and statutory right under PURPA to sell its entire net output to PGE at avoided cost rates contained in a long-term contract, and PáTu's rights under the FPA to require PGE to accept transmission deliveries of PáTu's entire net output so that the entire net output may be sold at the full avoided cost rates in the contract.

### A.     PURPA's Mandatory Purchase Obligation

10.     Congress enacted PURPA in 1978 as part of a package of legislation designed to address a nationwide energy crisis.  *See FERC v. Mississippi*, 456 U.S. 742, 745, 750 (1982).

11.     In section 210(a) of PURPA, 16 U.S.C. § 824a-3(a), Congress required FERC to promulgate "such rules as it determines necessary to encourage cogeneration and small power production" development.  *See generally* 18 C.F.R. pt. 292.

12.     Section 210(a) of PURPA imposes on electric utilities an obligation to purchase all electric energy and capacity made available from qualifying cogeneration and small power

Page 4 – Plaintiff's Complaint
{02859075.DOCX;1 }

production facilities using a renewable fuel source.  16 U.S.C. § 824a-3(a).  FERC's regulations

implementing Section 210(a) require the utility to purchase all electric energy and capacity made

available from the QF whether made available directly to the utility or indirectly over a third-

party utility's transmission system to the purchasing utility.  *See* 18 C.F.R. § 292.303(a), (d).

13.     FERC's regulations provide QFs with an option to sell electric energy and capacity to

electric utilities pursuant to a long-term contract with the rate determined at the time the

obligation is incurred.  *See* 18 C.F.R. § 292.304(d)(2).

14.     Section 210(f) of PURPA, 16 U.S.C. § 824a-3(f), requires state regulatory authorities and

non-regulated electric utilities to implement FERC's PURPA regulations.

15.     The State of Oregon has implemented FERC's regulations through statutes, ORS 758.505

to 758.550, administrative rules of the OPUC, Ore. Admin. Rules 860-029 *et seq.*, and orders of

the OPUC.

## B.     The Federal Power Act

16.     While states have the authority under PURPA to require utilities to enter into long-term

contracts for the purchase of a QF's net output, the FPA provides FERC with jurisdiction to

compel the purchasing utility in a PURPA purchase to accept the transmission deliveries made by

the QF to the utility.

17.     The FPA applies to the transmission of electric energy in interstate commerce.  16 U.S.C.

§ 824(b).

18.     Section 206 of the FPA, 16 U.S.C. § 824e(a), provides any person with the right to file a

complaint with FERC against a public utility related to transmission and requires FERC to

"determine . . . the just and reasonable . . . practice" if it finds any "practice" by a public utility is

Page 5 – Plaintiff's Complaint
{02859075.DOCX;1 }

unjust and unreasonable.   Section 309 of the FPA grants the Commission the "power to perform any and all acts … as it may find necessary or appropriate to carry out the provisions of [the FPA]," provided that the action "conforms with the purposes and policies of Congress and does not contravene any terms of the [FPA]."  16 U.S.C. § 825h.

19.    FERC's orders resolving a FPA complaint are immediately binding federal law, unless and until vacated in a direct appeal to the United States Court of Appeals. *See, e.g.,* 16 U.S.C. § 825h; 16 U.S.C. § 825l; 16 U.S.C. § 825o(b) .

20.    FERC's orders issued under the FPA are enforceable in the District Courts of the United States, where an aggrieved party may obtain enforcement of any liability or duty created by, or to enjoin any violation of such FERC order.  16 U.S.C. § 825p.

## V.    FACTS COMMON TO ALL CLAIMS

21.    Plaintiff PáTu Wind Farm, LLC owns and operates a wind generation facility with a nameplate capacity of 9.0 megawatts ("MW"), consisting of six General Electric 1.5 MW wind turbines, located in Sherman County, Oregon.

22.    The PáTu wind facility is electrically interconnected with the local distribution cooperative utility, Wasco Electric Cooperative, Inc. ("Wasco").

23.    PáTu's electrical generation is metered at the point of interconnection in kWh.

24.    PáTu entered into a long-term point-to-point transmission service agreement with Wasco for delivery from the point of interconnection to Bonneville Power Administration's ("BPA") DeMoss substation.

25.    PáTu entered into a long-term point-to-point transmission service agreement with BPA for delivery from BPA's DeMoss substation to PGE's system at the Troutdale substation.

Page 6 – Plaintiff's Complaint
{02859075.DOCX;1 }

26.     On or about April 29, 2010, PáTu and PGE entered into the OPUC's standard PURPA contract with a 20-year term, containing the OPUC-approved standard avoided cost rates (or the "Contract Rate") for PGE for the first 15 years after deliveries were scheduled to commence in October 2010.

27.     A true and correct copy of the standard PURPA contract executed by PáTu and PGE is attached as Exhibit 1 and incorporated herein by reference.

28.     For the first 15 years of the contract term, PáTu's standard PURPA contract defines the Contract Rate as the rates contained in the then-effective PGE Schedule 201, which in turn contains the OPUC-approved, long-term, fixed avoided cost rates calculated based upon the methodology approved by the OPUC in OPUC Order Nos. 05-584 and 07-360.

29.     In OPUC Order No. 07-360, the OPUC described integration as the process of accommodating the variable output of intermittent resources, such as wind, as part of the utility's portfolio, and addressed how to account for such costs in the avoided costs offered to QFs.

30.     In OPUC Order No. 07-360, the OPUC found that under the standard contract with standard rates, small QFs up to 10 MW in capacity utilizing wind as the fuel source are not responsible for wind integration costs because those costs were already taken into account in calculating the avoided cost rate.

31.     PáTu's standard PURPA contract provides: "Seller shall sell and PGE shall purchase the entire Net Output . . . ."  Exhibit 1 at Recitals.

32.      PáTu's standard PURPA contract defines "Net Output" as "all energy expressed in kWhs produced by the Facility, less station and other onsite use and less transformation and transmission losses."   Exhibit 1 at § 1.18.

Page 7 – Plaintiff's Complaint
{02859075.DOCX;1 }

33.    PáTu's standard PURPA contract further requires PáTu to "make commercially reasonable efforts to schedule in any hour an amount equal to its expected Net Output for the hour" and explicitly provides that "Net Output" is to be measured in kWh, not MWh.  Exhibit 1 at §§ 1.18, 4.4.  One MWh equals 1,000 kWh.

34.    PáTu's 9-MW wind generation facility rarely produces hourly generation in a whole MWh increment (such as 2 MWh, 3 MWh, 4 MWh, etc), and instead PáTu's meter typically registers some increment of kWh generation over any given hour (such as 3,320 kWh).

35.    Under a MWh-block delivery practice, the generator must preschedule a whole MWh increment of electricity to be delivered over the upcoming hour and may not update that schedule during the hour.

36.    The MWh-block delivery practice requires the transmission provider to make up the difference between the prescheduled amount (in MWh) and the actual generation (in kWh).

37.    Under the MWh-block delivery practice, BPA requires wind generators, such as PáTu, to pay for several integration charges, including BPA's Generator Imbalance Service, Spinning Reserves, Supplemental Reserves, Regulating Reserves, Following Reserves, and Imbalance Reserves (collectively "BPA integration services").

38.    More precise forms of delivery than the MWh-block delivery practice exist.  In fact, FERC has declared that, for variable renewable generators such as wind generators, the MWh-block delivery practice is unjust and unreasonable, and it therefore ordered transmission providers such as BPA to develop more appropriate scheduling approaches.  *Integration of Variable Energy Resources*, Order No. 764, FERC Stats. & Regs. ¶ 31,331, 77 Fed. Reg. 41,482 (July 13, 2012), *grant'g clarif.* 141 FERC ¶ 61,232 (Dec. 20, 2012), *den'g reh'g* 144 FERC ¶

61,222 (Sept. 19, 2013).

39.     Dynamic scheduling is a form of transmission delivery whereby a generator's precise output is delivered in real time on a kWh-basis to the receiving utility.

40.     At all times since PáTu achieved commercial operation on or about November 30, 2010, dynamic scheduling has been available to PáTu from its transmission provider, BPA.  BPA has a standard dynamic scheduling business practice that it offers to all of its transmission customers, including PáTu ("BPA's dynamic scheduling service").

41.     At all times since commercial operation of the PáTu wind generation facility, BPA's transmission tariffs and business practices have established that PáTu can only avoid paying for BPA's integration services by delivering via BPA's dynamic scheduling service.

42.     Several months prior to commercial operation of the PáTu wind generation facility, PáTu enrolled in BPA's dynamic scheduling pilot program, and BPA and PáTu informed PGE that PáTu and BPA planned to deliver PáTu's net output to PGE via dynamic scheduling.

43.     Several months prior to commercial operation of the PáTu wind generation facility, PGE possessed knowledge that PáTu and BPA planned to deliver via dynamic scheduling.

44.     On or about September 7, 2010, BPA and PáTu entered into an agreement governing engineering and planning necessary to make deliveries to PGE at the Troutdale substation via dynamic scheduling.

45.     On or about September 14, 2010, PáTu paid BPA $15,000.00 to conduct an engineering study necessary to make deliveries via dynamic scheduling deliveries.

46.     On or about November 30, 2010, PáTu began generating, delivering, and selling electricity to PGE under the standard PURPA contract.

47.     On each day since PáTu first started generating electricity on or about November 30, 2010, PGE, acting as the receiving transmission provider, has failed to accept deliveries of the PáTu net output delivered via BPA's dynamic scheduling service and has instead required MWh-block deliveries that include BPA integration services paid for by PáTu.

48.     PGE's refusal to accept deliveries of PáTu's net output via dynamic scheduling have required PáTu to deliver via the MWh-block delivery practice at all times since the PáTu facility achieved commercial operation on or about November 30, 2010.

49.     Because wind generation varies with wind speed, which cannot be controlled, PáTu cannot deliver its precise net output in kWh in each hour under the MWh-block delivery practice.

50.     When PáTu over-generates by generating more power (in kWh) than it has prescheduled (in MWh), that net output becomes "unscheduled net output," which BPA accepts but does not deliver to PGE under the MWh-block delivery practice.

51.     In contrast, when PáTu under-generates by generating less electricity (in kWh) than it has scheduled (in MWh), BPA delivers the full prescheduled MWh blocks of electrical energy to PGE under the MWh-block delivery practice.

52.     PGE's refusal to accept deliveries via BPA's dynamic scheduling service prevents PáTu from delivering its net output that is unscheduled net output.

53.     On each day since PáTu first started generating electricity on or about November 30, 2010, PGE has failed to accept and purchase any unscheduled net output.

54.     Through PGE's rejection of PáTu's deliveries via BPA's dynamic scheduling service, PGE has at all times relevant to this complaint obtained the benefit of receiving the BPA integration services provided to PGE at PáTu's expense with the MWh-block deliveries.

Page 10 – Plaintiff's Complaint
{02859075.DOCX;1 }

55.     PGE has required MWh-block deliveries with the knowing intent to obtain the benefit of receiving the BPA integration services provided to PGE at PáTu's expense with the MWh-block deliveries.

56.     In order to make the MWh-block deliveries PGE required, PáTu has paid BPA for BPA integration services on the following dates in the following amounts: February 17, 2011 - $16,373.00, March 24, 2011 - $30,510.00, April 25, 2011- $29,015.00, May 2, 2011 - $35,796.00, June 8, 2011 - $29,438.00, July 18, 2011 - $33,588.00, August 10, 2011 - $32,059.00, September 6, 2011 - $12,728.00, October 11, 2011 - $25,395.00, November 9, 2011 - $29,506.00, December 23, 2011 - $22,396.00, January 6, 2012 - $24,128.00, February 15, 2012 - $19,220.00, April 6, 2012 - $17,665.00, April 10, 2012 - $19,254.00, May 7, 2012 - $16,224.00, July 9, 2012 - $16,652.00, August 1, 2012 - $17,025.00, August 6, 2012 - $15,277.00, September 10, 2012 - $17,772.00, October 9, 2012 - $19,414.00, October 29, 2012 - $20,694.00, November 27, 2012 - $21,188.00, January 4, 2013 - $28,215.00, February 5, 2013 - $26,643.00, March 5, 2013 - $26,705.00, April 5, 2013 - $25,498.00, May 8, 2013 - $32,839.00, June 7, 2013 - $25,228.00, July 10, 2013 - $27,874.00, August 12, 2013 - $27,305.00, September 4, 2013 - $26,506.00, October 10, 2013 - $29,175.00, November 12, 2013 - $23,567.00, December 9, 2013 - $25,056.00, January 8, 2014 - $28,545.00, February 11, 2014 - $34,835.00, March 19, 2014 - $28,478.00, April 7, 2014 - $40,028.00, May 12, 2014 - $25,381.00, June 10, 2014 - $26,038.00, July 10, 2014 - $25,757.00, August 11, 2014 - $22,544.00, September 2, 2014 - $25,920.00, October 9, 2014 - $28,656.00, November 21, 2014 - $22,562.00, December 11, 2014 - $24,213.00, January 8, 2015 - $24,169.00, February 10, 2015 - $21,999.00, March 19, 2015 - $20,416.00, April 30, 2015 - $590.00, May 11, 2015 - $21,049.00, May 19, 2015 -

$19,975.00, June 11, 2015 - $25,441.00, June 30, 2015 - $686.00, July 9, 2015 - $25,839.00.

57.    PáTu has been deprived of the use of its money paid to BPA for BPA integration services at all times since the date of such payments were made to BPA in each month.

58.    Beginning at the time of commercial operation on or about November 30, 2010, PGE initially paid PáTu the Contract Rate for all electricity scheduled and delivered to PGE on PáTu's behalf by BPA through the MWh-block deliveries.

59.    On or about May 12, 2011, representatives from PáTu and PGE discussed scheduling and delivery at the PáTu wind generation facility, and PGE again expressed that it would not accept PáTu's efforts to make deliveries via BPA's dynamic scheduling service.

60.    On or about September 29, 2011, PGE sent PáTu a letter, wherein PGE expressed dissatisfaction with the accuracy of PáTu's transmission deliveries and stated that PGE would refuse to pay the Contract Rate for all prescheduled electricity in events of under-generation, where the actual generation in kWh was less than the amount of electricity delivered in MWh-blocks.

61.    In PGE's letter dated September 29, 2011, PGE introduced the term "Excess Energy" to describe the portions of the delivered MWh blocks of energy that were in excess of the PáTu facility's kWh net output during an event of under-generation. PGE unilaterally proposed to calculate the "Excess Energy" PáTu and BPA had cumulatively delivered in each daily heavy-load and light-load period as defined in the contract, and to pay PáTu a market index rate for those deliveries.

62.    The term "Excess Energy" does not exist in, and is not defined by, PáTu's standard PURPA contract.

63.     The market index rate PGE proposed to pay for "Excess Energy" has typically been far less than the Contract Rate in PáTu's standard PURPA contract.

64.     In a subsequent letter dated October 17, 2011, PGE retroactively applied the recalculated rate for "Excess Energy" as proposed in its letter dated September 29, 2011, for each monthly invoice for electricity sales beginning with the first monthly invoice from December 2010.

65.     On or about October 21, 2011, PáTu stated, in a letter through its counsel, that PGE's refusal to accept dynamically scheduled deliveries was the root cause of PGE's need to accept and pay for "Excess Energy" at the Contract Rate, and PáTu reiterated its request that PGE accept dynamically scheduled deliveries.

66.     On or about November 3, 2011, PGE, in a letter through its counsel, again rejected PáTu's request that PGE accept deliveries via dynamic schedule.

67.     PáTu has never consented to PGE's reduced payments for "Excess Energy" and has invoiced PGE in each monthly invoice at the Contract Rate for all electricity delivered via MWh-block deliveries.

68.     In response to each of PáTu's monthly invoices, PGE has implemented its reduced payments for "Excess Energy" according to the unilaterally-created and extra-contractual formula first described in PGE's September 29, 2011 letter, by monthly letters sent to PáTu on or about September 29, 2011, October 17, 2011, November 3, 2011, December 2, 2011, January 10, 2012, February 8, 2012, March 8, 2012, April 11, 2012, May 2, 2012, June 4, 2012, July 6, 2012, August 7, 2012, September 7, 2012, October 5, 2012, November 9, 2012, December 10, 2012, January 7, 2013, February 4, 2013, March 7, 2013, April 4, 2013, May 8, 2013, June 6, 2013, July 1, 2013, August 1, 2013, September 4, 2013, October 4, 2013, November 4, 2013,

Page 13 – Plaintiff's Complaint
{02859075.DOCX;1 }

December 9, 2013, January 2, 2014, February 3, 2014, March 24, 2014, April 7, 2014, May 1, 2014, June 6, 2014, July 2, 2014, August 5, 2014, September 4, 2014, October 3, 2014, November 5, 2014, December 3, 2014, January 6, 2015, February 3, 2015, March 2, 2015, April 3, 2015, May 4, 2015, April 3, 2015, May 4, 2015, and June 2, 2015. PáTu has been deprived of the use of its money withheld by PGE on each of these dates for electricity PGE has redefined as "Excess Energy."

69.     On December 12, 2011, PáTu filed a complaint against PGE at the OPUC ("OPUC Complaint"), alleging nine claims.

70.     Four of PáTu's claims in its OPUC Complaint asserted that PGE's refusal to accept net output delivered via BPA's dynamic scheduling service violated PáTu's standard PURPA contract, PURPA and FERC's PURPA regulations, Oregon law incorporating FERC's PURPA regulations, and the OPUC's avoided cost pricing policies.

71.     In OPUC Order Nos. 12-316 and 12-494, issued on or about August 21, 2012 and December 20, 2012, respectively, the OPUC ruled that it lacked jurisdiction over the four claims in the OPUC Complaint alleging violations related to refusal to accept net output delivered via dynamic scheduling on the ground that those claims were within FERC's exclusive jurisdiction over interstate transmission.

72.     True and correct copies of OPUC Order Nos. 12-316 and 12-494 are attached as Exhibit No. 2 and Exhibit No. 3, respectively, and are each incorporated herein by reference.

73.     PáTu's OPUC Complaint also raised four claims that sought an OPUC Order directing PGE to pay PáTu the Contract Rate for all electricity delivered via the MWh-block delivery practice, including such amounts that exceeded PáTu's net output and had been deemed by PGE

Page 14 – Plaintiff's Complaint
{02859075.DOCX;1 }

to be "Excess Energy."  PáTu did not seek damages at the OPUC because the OPUC lacks

authority to award damages.  In OPUC Nos. 14-287 and 14-425, the OPUC denied PáTu's claims

that asked the OPUC to order PGE to pay PáTu the Contract Rate for all electricity delivered via

the MWh-block delivery practice.  PáTu has sought judicial review of OPUC Order Nos. 14-287

and 14-425, in the Oregon Court of Appeals, and that judicial review is pending at the time of the

filing of this complaint.

74.    On or about September 15, 2014, PGE, by electronic mail through its counsel, again

indicated that PGE would continue to accept only prescheduled, hourly, MWh-block deliveries

made by BPA on PáTu's behalf, and PGE would not agree to accept deliveries on a 15-minute

scheduling basis through BPA's 15-minute scheduling tariff.

75.    On or about October 10, 2014, PáTu filed an FPA Complaint at FERC against PGE.

76.    PáTu's FPA Complaint alleged, *inter alia*, that PGE had violated the FPA by refusing to

accept PáTu's entire net output via BPA's dynamic scheduling service, and sought reparations

under the FPA for that violation.  PGE answered and argued in opposition to PáTu's FPA

Complaint before FERC.

77.    On or about January 22, 2015, FERC granted in part and dismissed in part PáTu's FPA

Complaint. *PáTu Wind Farm, LLC v. Portland General Electric Co.*, 150 FERC ¶ 61,032 (Jan.

22, 2015) ("January 22nd FERC Order").

78.    A true and correct copy of the January 22nd FERC Order is attached as Exhibit 4 and

incorporated herein by reference.

79.    On or about January 27, 2015, PáTu, by letter through counsel, sought PGE's

confirmation that it would begin accepting PáTu's deliveries via BPA's dynamic scheduling

Page 15 – Plaintiff's Complaint
{02859075.DOCX;1 }

service in order to comply with the January 22nd FERC Order.

80.     On or about February 6, 2015, PGE, by letter through its counsel, indicated that it would only agree to accept dynamically scheduled deliveries if PáTu paid PGE for integration costs that PGE would incur with acceptance of PáTu's net output on a kWh-basis with BPA's dynamic scheduling service.

81.     PáTu did not agree to PGE's February 6, 2015 proposal, that PáTu pay PGE for integration services as a precondition to PGE's acceptance of PáTu's net output on a kWh-basis with BPA's dynamic scheduling service.

82.     On or about June 18, 2015, FERC issued another order on PáTu's FPA Complaint, denying rehearing and clarification requests by the parties to the proceeding.  *PáTu Wind Farm, LLC v. Portland General Electric Co.*, 151 FERC ¶ 61,223 (June 18, 2015) ("June 18th FERC Order").

83.      A true and correct copy of FERC's June 18th FERC Order is attached as Exhibit 5 and incorporated herein by reference.

84.     In the June 18th FERC Order, FERC summarized its January 22nd FERC Order as follows:

> "[FERC] determined in the January 22 Order that ' . . . regardless of the transmission service that Portland General's merchant function uses to subsequently deliver the net output to Portland General's load, Portland General must take from PáTu its *entire* net output (all energy less onsite uses and losses) delivered and to do so at avoided cost rates.'  [FERC] observed that '[i]f . . . Portland General were permitted on this basis to refuse to accept PáTu's entire net output [by only accepting delivery of scheduled net output], Portland General and other electric utilities could routinely escape their PURPA mandatory purchase obligation . . . by imposing overly restrictive or un-meetable scheduling requirements, or by the purchasing electric utility's failing to arrange the necessary transmission service to dispose of its purchase of the QF's entire net output once it has been delivered to the utility.'  [FERC] further observed, 'PáTu and BPA are willing to deliver PáTu's entire net output to Portland General using

Page 16 – Plaintiff's Complaint
{02859075.DOCX;1 }

> dynamic scheduling, and we find that the Standard Contract does not preclude the ability to do that or Portland General's obligation to purchase PáTu's entire net output by those means.'"

June 18th FERC Order at P 44 (footnotes omitted).[1]

85.    After PGE claimed it was in compliance with federal law on rehearing, FERC further

ordered:

> "[I]t is clear that Portland General (and not PáTu) has dictated the manner by which PáTu currently delivers its net output to Portland General to honor the prescheduled amount. By requiring a firm, whole MW-hour product from PáTu, Portland General prevents PáTu from delivering its entire net output and Portland General is thereby able to escape its mandatory purchase obligation as it applies to PáTu's unscheduled net output. . . . Portland General must treat PáTu, an off-system QF, as it would treat an on-system QF, and Portland General must purchase PáTu's entire net output. Where PáTu has made arrangements to transmit to Portland General its entire net output pursuant to a dynamic schedule with BPA, Portland General may not require a different type of schedule and then claim that it is only obligated to purchase and pay avoided cost rates for a lesser amount of energy delivered pursuant to that different type of schedule."

*Id.* at P 46.

86.    FERC further reasoned:

> "Again, it is Portland General's responsibility, under PURPA and the [FERC]'s regulations, to purchase PáTu's net output, scheduled and unscheduled, and therefore Portland General cannot set requirements that limit its purchase to only PáTu's scheduled net output. . . . Essentially, Portland General is only willing to accept PáTu's entire net output if PáTu over-schedules and incurs additional charges and penalties. Portland General's actions, even if PáTu chooses to intentionally over-schedule in response (as PáTu appears to have done), are inconsistent with PURPA, [FERC]'s regulations, and the Standard Contract."

*Id.* at P 48 (footnotes omitted).

87.    In response to PGE's argument that the OPUC's standard PURPA contract and the

OPUC's implementation of PURPA stood as a defense, FERC ordered:

Page 17 – Plaintiff's Complaint

"[T]he January 22 Order did not find that the Standard Contract violates PURPA. On the contrary, it is Portland General's actions dictating the manner by which PáTu delivers its net output, which are not mandated by the Standard Contract, that are in violation of PURPA. Therefore, PáTu's filing a FPA section 206 Complaint against Portland General was appropriate."

*Id.* at P 49 (footnotes omitted).

88.    FERC further interpreted PáTu's standard PURPA contract and PáTu's rights under the

OPUC avoided cost rate orders establishing the rates in the contract.  FERC ordered: "[T]he

Oregon Commission has found that, under the Standard Contract pursuant to which PáTu sells to

Portland General, small QFs such as PáTu are not responsible for additional wind integration

costs because those costs were already taken into account in calculating the avoided cost rate."

*Id.* at P 53.

89.    With regard to PáTu's request for monetary reparations under the FPA, FERC

determined: "PáTu is essentially asking for damages resulting from a Portland General breach of

contract. Under these circumstances, whether 'reparations' are owed, and in what amount, is a

matter best left to the Oregon Commission or an appropriate court."  January 22nd FERC Order at

P 57.

90.    PGE has not agreed that it will comply with the January 22nd FERC Order and the June

18th FERC Order for the remainder of the 20-year term of PáTu's standard PURPA contract.

91.    The BPA engineering study funded by PáTu on or about September 14, 2010, has been

rendered useless and must be conducted again in order to complete deliveries via BPA's dynamic

scheduling service due to PGE's delay in refusing to accept such deliveries.  PáTu has been

deprived of the use of its money paid to BPA for the BPA dynamic scheduling study at all times

---

[1]    P refers to the paragraph number in FERC orders.

since the date such payment was made to BPA on or about September 14, 2010.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Enforcement of FERC Orders)

92.    Plaintiff PáTu re-alleges and incorporates by reference paragraphs 1 through 91.

93.    The January 22nd FERC Order and the June 18th FERC Order require PGE to accept PáTu's entire net output, including PáTu's unscheduled net output.

94.    As required in those FERC orders, where PáTu has made arrangements to transmit to PGE its entire net output pursuant to BPA's dynamic scheduling service, PGE may not require a different type of schedule and must accept PáTu's unscheduled net output.

95.    PGE's practice of accepting only prescheduled MWh-block deliveries therefore violates PáTu's right to deliver its entire net output, including unscheduled net output, and unlawfully conditions PGE's acceptance of the entire net output on PáTu's payment of additional charges and penalties associated with BPA integration services.

96.    The January 22nd FERC Order and the June 18th FERC Order were issued under the FPA and/or Section 210(h)(1) of PURPA, and Plaintiff PáTu is therefore entitled to enforcement of those orders in this Court.  16 U.S.C. § 825p.

97.    PáTu has suffered, and is continuing to suffer, irreparable injury as a result of PGE's refusal to accept PáTu's entire net output delivered on a kWh-basis without requiring PáTu to provide BPA integration services to PGE.

98.    Monetary damages alone are inadequate to remedy PáTu's injuries because PGE's refusal to accept deliveries of net output is ongoing and will continue to harm PáTu's ability to receive

Page 19 – Plaintiff's Complaint
{02859075.DOCX;1 }

the statutory and contractual benefits to which it is entitled over the remainder of the 20-year term of the standard PURPA contract.

99.    Considering the balance of hardships between PáTu and PGE, a remedy in equity is warranted and the public interest would not be disserved by a permanent injunction.

100.    Accordingly, the Court should enter declaratory and injunctive relief enforcing the January 22nd FERC Order and the June 18th FERC Order by: (i) declaring PGE must comply with those FERC orders; (ii) permanently ordering PGE to cease and desist from its current practice of accepting only prescheduled MWh-block deliveries; and (iii) permanently enjoining PGE to accept PáTu's entire net output, including PáTu's unscheduled net output, delivered via BPA's dynamic scheduling service without conditioning such acceptance on PáTu's payment of any charges and penalties associated with integration services.

### SECOND CLAIM FOR RELIEF

### (Violations of State Statutes; Ore. Rev. Stat. 756.185 and Ore. Rev. Stat. 758.505 *et seq.*)

101.    Plaintiff PáTu re-alleges and incorporates by reference paragraphs 1 through 91.

102.    Oregon Revised Statutes Chapter 758 incorporates FERC's requirement, in 18 C.F.R. § 292.303, that electric utilities purchase any energy and capacity made available from a QF indirectly to the electric utility.  *See, e.g.,* ORS 758.525; ORS 758.535; Ore. Admin. R. 860-029-0030.

103.    Oregon law further provides that any public utility which does, or causes or permits to be done, any matter, act or thing prohibited by Oregon Revised Statutes Chapter 758 or omits to do any act, matter or thing required to be done by such statutes, is liable to the person injured thereby in the amount of damages sustained in consequence of such violation.  ORS 756.185(1).

If the wrong or omission was the result of gross negligence or willful misconduct, the public utility is liable to the person injured thereby in treble the amount of damages sustained in consequence of the violation. *Id.*  Furthermore, the court may award reasonable attorney fees to the prevailing party.  *Id.*

104.    PGE is a public utility to which ORS 756.185 applies.

105.    FERC has found that PGE violated the requirement in 18 C.F.R. § 292.303 that electric utilities purchase any energy or capacity made available indirectly from a QF over a third-party utility's transmission system.  January 22nd FERC Order at PP 49-54; June 18th FERC Order at PP 46, 48, 49.  PGE therefore necessarily has also violated Oregon Revised Statutes Chapter 758 which incorporates the requirements of 18 C.F.R. § 292.303.

106.    On each day since PáTu first started generating electricity on or about November 30, 2010, PGE, acting as the receiving transmission provider, has failed to accept deliveries of the PáTu net output made available to PGE from BPA via BPA's dynamic scheduling service and has instead required MWh-block deliveries that include BPA integration services paid for by PáTu, in violation of the requirements of Oregon Revised Statutes Chapter 758.

107.    PáTu is entitled to actual damages resulting from PGE's refusal to accept and purchase all of PáTu's net output made available indirectly over Wasco's and BPA's systems via BPA's dynamic scheduling service, which damages include through the date of this complaint: (i) no payment from PGE at Contract Rates for PáTu's unscheduled net output totaling an estimated amount of $182,965.60 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $46,559.83; (ii) payment by PáTu to BPA for BPA's integration services totaling an estimated $1,339,049.00 plus prejudgment interest pursuant to ORS 82.010 in the estimated

Page 21 – Plaintiff's Complaint
{02859075.DOCX;1 }

amount of $305,789.65; (iii) payment by PáTu to BPA for BPA engineering studies on or about September 14, 2010, to implement the rejected dynamic scheduling deliveries which total an estimated $15,000.00 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $6,553.97.

108.    PGE acted with near total disregard or indifference to the rights of PáTu or the probable consequences of PGE's course of conduct when it refused to accept and purchase all of PáTu's net output made available indirectly via BPA's dynamic scheduling service, or otherwise committed grossly negligent misconduct as set forth in ORS 756.185.

109.    PGE acted with knowledge of its actions and acted as a free agent that intended to do what it was doing when it refused to accept and purchase all of PáTu's net output made available indirectly via BPA's dynamic scheduling service, or otherwise committed willful misconduct as set forth in ORS 756.185.

110.    PáTu is entitled to treble damages as a consequence of PGE's grossly negligent or willful violations of the requirements of Oregon Revised Statutes Chapter 758, in an amount estimated, through the date of this complaint, to be $4,611,043.80 plus $1,076,710.35 in prejudgment interest pursuant to ORS 82.010.

111.    PáTu continues to incur damages under this claim due to PGE's ongoing violations of law and is therefore entitled to damages and prejudgment interest accruing after the date of this complaint.

112.    PáTu is further entitled to its reasonable attorney fees in recovering its damages pursuant to ORS 756.185.

**THIRD CLAIM FOR RELIEF**

**(Breach of Contract; Prevention of Performance – Failure to Accept Deliveries)**

113.    Plaintiff PáTu re-alleges and incorporates by reference paragraphs 1 through 91.

114.    PáTu has performed under the contract by making available to PGE deliveries of the PáTu facility's net output on a kWh-basis via BPA's dynamic scheduling service at all times since the facility first achieved commercial operation on or about November 30, 2010.

115.    PGE has separately breached the contract and prevented PáTu's performance thereunder on each day since PáTu first started generating electricity on or about November 30, 2010, by failing to accept deliveries of the PáTu facility's net output via BPA's dynamic scheduling service and instead requiring MWh-block deliveries that include BPA integration services paid for by PáTu.

116.    PáTu's damages resulting from PGE's refusal to accept and purchase all of PáTu's net output made available indirectly via BPA's dynamic scheduling service include through the date of this complaint: (i) no payment from PGE at Contract Rates for PáTu's unscheduled net output totaling an estimated amount of $182,965.60 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $46,559.83 ; (ii) payment by PáTu to BPA for BPA's integration services totaling an estimated $1,339,049.00 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $305,789.65 ; (iii) payment by PáTu to BPA for BPA engineering studies on or about September 14, 2010, to implement the rejected dynamic scheduling deliveries which total an estimated $15,000.00 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $6,553.97 .

117.    PáTu continues to incur damages under this claim due to PGE's ongoing violations of law and contract and is therefore entitled to damages and prejudgment interest accruing after the date

{02859075.DOCX;1 }

of this complaint.

118.    PáTu has suffered, and is continuing to suffer, irreparable injury as a result of PGE's

refusal to accept PáTu's entire net output delivered on a kWh-basis without requiring PáTu to

provide BPA integration services to PGE.

119.    Monetary damages alone are inadequate to remedy PáTu's injuries because PGE's refusal

to accept deliveries of net output is ongoing and will continue to harm PáTu's ability to receive

the statutory and contractual benefits to which it is entitled over the remainder of the 20-year

term of the standard PURPA contract.

120.    Considering the balance of hardships between PáTu and PGE, a remedy in equity is

warranted and the public interest would not be disserved by a permanent injunction.

## FOURTH CLAIM FOR RELIEF

### (Breach of Good Faith and Fair Dealing – Failure to Accept Deliveries)

121.    Plaintiff PáTu re-alleges and incorporates by reference paragraphs 1 through 91.

122.    The implied covenant of good faith and fair dealing is incorporated by law into the

standard PURPA contract.

123.    PáTu has performed under the contract by making available to PGE the PáTu facility's

net output on a kWh-basis via BPA's dynamic scheduling service at all times since the facility

first achieved commercial operation on or about November 30, 2010.

124.    In refusing to cooperate or otherwise accept deliveries of net output on a kWh-basis via

BPA's dynamic scheduling service, PGE intended to receive the benefits of BPA's integration

services at PáTu's expense.

125.    PGE has separately breached the covenant of good faith and fair dealing and prevented

{02859075.DOCX;1 }

PáTu's performance on the contract on each day since PáTu first started generating electricity on or about November 30, 2010, by failing to accept deliveries of the PáTu facility's net output via BPA's dynamic scheduling service and instead requiring MWh-block deliveries that include BPA integration services paid for by PáTu.

126.    PáTu's damages resulting from PGE's refusal to accept and purchase all of PáTu's net output made available indirectly over Wasco's and BPA's systems via BPA's dynamic scheduling service include through the date of this complaint: (i) PGE's failure to pay the Contract Rate for PáTu's unscheduled net output totaling an estimated amount of $182,965.60 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $46,559.83; (ii) the amount PaTu was forced to pay BPA for integration services as a result of PGE's breach, which totals an estimated $1,339,049.00 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $305,789.65; (iii) payment by PáTu to BPA for BPA engineering studies on or about September 14, 2010, to implement the rejected dynamic scheduling deliveries which total an estimated $15,000.00 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $6,553.97 .

127.    PáTu continues to incur damages under this claim due to PGE's ongoing violations of law and is therefore entitled to damages and prejudgment interest accruing after the date of this complaint.

128.    PáTu has suffered, and is continuing to suffer, irreparable injury as a result of PGE's refusal to accept PáTu's entire net output delivered on a kWh-basis without requiring PáTu to provide BPA integration services to PGE.

129.    Monetary damages alone are inadequate to remedy PáTu's injuries because PGE's refusal

Page 25 – Plaintiff's Complaint
{02859075.DOCX;1 }

to accept deliveries of net output is ongoing and will continue to harm PáTu's ability to receive

the statutory and contractual benefits to which it is entitled over the remainder of the 20-year

term of the standard PURPA contract.

130.     Considering the balance of hardships between PáTu and PGE, a remedy in equity is

warranted and the public interest would not be disserved by a permanent injunction.

## FIFTH CLAIM FOR RELIEF

### (Quantum Meruit – Requirement to Provide Additional Services)

131.     Plaintiff PáTu re-alleges and incorporates by reference paragraphs 1 through 91.

132.     The standard PURPA contract entered into by PáTu and PGE only requires PáTu to

deliver its net output on a kWh-basis, and does not require PáTu to supply PGE with BPA's

integration services as a precondition for the right to receive payment for the facility's net output.

133.     On each day since PáTu's facility achieved commercial operation on or about November

30, 2010, PGE has prevented delivery of PáTu's net output on a kWh-basis, and instead

conditioned acceptance of any amount of net output on the requirement that PáTu provide PGE

with additional services in the form of BPA's integration services delivered to PGE through the

MWh-block delivery practice.

134.     On each day since PáTu's facility achieved commercial operation on or about November

30, 2010, PGE has obtained the benefit of receiving the MWh-block deliveries, including the

value of the BPA integration services included with such deliveries.

135.     PGE is aware that it received the benefits of the BPA integration services.

136.     PáTu has thereby performed under a separate implied contract for additional services

and/or products supplied by PáTu to PGE in the form of BPA's integration services.

Page 26 – Plaintiff's Complaint

137.    Under the circumstances, it would be unjust to allow PGE to receive the benefit of the BPA integration services without requiring PGE to pay PáTu for its expenses in supplying the BPA integration services to PGE.

138.    PáTu's damages resulting from PGE's requirement that PáTu provide the additional services of BPA's integration services total an estimated $1,339,049.00 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $305,789.65 through the date of this complaint.

139.    PáTu continues to incur damages under this claim due to PGE's ongoing violations of law and is therefore entitled to damages and prejudgment interest accruing after the date of this complaint.

140.    PáTu has suffered, and is continuing to suffer, irreparable injury as a result of PGE's refusal to accept PáTu's entire net output delivered on a kWh-basis without requiring PáTu to provide BPA integration services to PGE.

141.    Past monetary damages alone are inadequate to remedy PáTu's injuries under this claim because PGE's refusal to accept deliveries of net output is ongoing and will continue to harm PáTu's ability to receive the statutory and contractual benefits to which it is entitled over the remainder of the 20-year term of the standard PURPA contract.

142.    Considering the balance of hardships between PáTu and PGE, a remedy in equity is warranted and the public interest would not be disserved by a permanent injunction.

### SIXTH CLAIM FOR RELIEF

### (Breach of Contract; Prevention of Performance – Payment for "Excess Energy")

143.    Plaintiff PáTu re-alleges and incorporates by reference paragraphs 1 through 91.

Page 27 – Plaintiff's Complaint
{02859075.DOCX;1 }

144.    PáTu has performed under the contract by making available to PGE deliveries of the facility's net output on a kWh-basis via BPA's dynamic scheduling service at all times since the facility first achieved commercial operation on or about November 30, 2010.

145.    In refusing to cooperate or otherwise accept deliveries of net output on a kWh-basis via BPA's dynamic scheduling service, PGE intended to receive the benefits of BPA's integration services at PáTu's expense provided through the MWh-block delivery practice.

146.    In response to PGE's prevention of PáTu's ability to perform by delivering the wind generation facility's net output on a kWh-basis via BPA's dynamic scheduling service, PáTu performed its obligations by making available to PGE MWh-block deliveries.

147.    PáTu's standard PURPA contract requires PGE to pay PáTu the Contract Rate for all electricity deliveries made by the MWh-block deliveries PGE has required of PáTu.

148.    PGE has breached the contract by making reduced payments for "Excess Energy" at amounts other than the Contract Rate, according to the formula first described in PGE's September 29, 2011 letter, by monthly true-up letters sent to PáTu on or about September 29, 2011, October 17, 2011, November 3, 2011, December 2, 2011, January 10, 2012, February 8, 2012, March 8, 2012, April 11, 2012, May 2, 2012, June 4, 2012, July 6, 2012, August 7, 2012, September 7, 2012, October 5, 2012, November 9, 2012, December 10, 2012, January 7, 2013, February 4, 2013, March 7, 2013, April 4, 2013, May 8, 2013, June 6, 2013, July 1, 2013, August 1, 2013, September 4, 2013, October 4, 2013, November 4, 2013, December 9, 2013, January 2, 2014, February 3, 2014, March 24, 2014, April 7, 2014, May 1, 2014, June 6, 2014, July 2, 2014, August 5, 2014, September 4, 2014, October 3, 2014, November 5, 2014, December 3, 2014, January 6, 2015, February 3, 2015, March 2, 2015, April 3, 2015, May 4, 2015, April 3, 2015,

May 4, 2015, and June 2, 2015.

149.    PáTu's damages resulting from PGE's breach of contract by refusing to pay the Contract Rate for deliveries PGE unilaterally deemed to be "Excess Energy" include through the date of this complaint: (i)  PGE's failure to pay the  Contract Rate for PáTu's unscheduled net output totaling an estimated $182,965.60 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $46,559.83 ; (ii) reduced payment to PáTu by PGE for deliveries deemed to "Excess Energy" at an estimated amount of $1,214,741.94 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $256,594.93; and (iii) payment by PáTu to BPA for BPA engineering studies on or about September 14, 2010, to implement the rejected dynamic scheduling deliveries which total an estimated $15,000.00 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $6,553.97 .

150.    PáTu continues to incur damages under this claim due to PGE's ongoing violations of law and contract and is therefore entitled to damages and prejudgment interest accruing after the date of this complaint.

151.    PáTu has suffered, and is continuing to suffer, irreparable injury as a result of PGE's refusal to accept PáTu's entire net output delivered on a kWh-basis without requiring PáTu to provide BPA integration services to PGE and refusing to pay the Contract Rate for all deliveries.

152.    Past monetary damages alone are inadequate to remedy PáTu's injuries because PGE's refusal to accept deliveries of net output and pay the Contract Rate for all deliveries is ongoing and will continue to harm PáTu's ability to receive the statutory and contractual benefits to which it is entitled over the remainder of the 20-year term of the standard PURPA contract.

153.    Considering the balance of hardships between PáTu and PGE, a remedy in equity is

warranted and the public interest would not be disserved by a permanent injunction.

**SEVENTH CLAIM FOR RELIEF**

**(Breach of Good Faith and Fair Dealing -- Payment for "Excess Energy")**

154.    Plaintiff PáTu re-alleges and incorporates by reference paragraphs 1 through 91.

155.    The implied covenant of good faith and fair dealing is incorporated by law into PáTu's standard PURPA contract.

156.    PáTu has performed under the contract by making available to PGE deliveries of the facility's net output on a kWh-basis via BPA's dynamic scheduling service at all times since the facility first achieved commercial operation on or about November 30, 2010.

157.    In refusing to cooperate or otherwise accept deliveries of net output on a kWh-basis via BPA's dynamic scheduling service, PGE intended to receive the benefits of BPA's integration services at PáTu's expense provided through the MWh-block delivery practice.

158.    In response to PGE's prevention of PáTu's ability to perform by delivering the wind generation facility's net output on a kWh-basis via BPA's dynamic scheduling service, PáTu performed its obligations by making available to PGE MWh-block deliveries.

159.    PáTu's standard PURPA contract requires PGE to pay PáTu the Contract Rate for all electricity deliveries made by the MWh-block deliveries PGE has required of PáTu.

160.    PGE has breached the implied covenant of good faith and fair dealing by making reduced payments for "Excess Energy" at amounts other than the Contract Rate, according to the formula first described in PGE's September 29, 2011 letter, by monthly true-up letters sent to PáTu on or about September 29, 2011, October 17, 2011, November 3, 2011, December 2, 2011, January 10, 2012, February 8, 2012, March 8, 2012, April 11, 2012, May 2, 2012, June 4, 2012, July 6, 2012,

Page 30 – Plaintiff's Complaint
{02859075.DOCX;1 }

August 7, 2012, September 7, 2012, October 5, 2012, November 9, 2012, December 10, 2012, January 7, 2013, February 4, 2013, March 7, 2013, April 4, 2013, May 8, 2013, June 6, 2013, July 1, 2013, August 1, 2013, September 4, 2013, October 4, 2013, November 4, 2013, December 9, 2013, January 2, 2014, February 3, 2014, March 24, 2014, April 7, 2014, May 1, 2014, June 6, 2014, July 2, 2014, August 5, 2014, September 4, 2014, October 3, 2014, November 5, 2014, December 3, 2014, January 6, 2015, February 3, 2015, March 2, 2015, April 3, 2015, May 4, 2015, April 3, 2015, May 4, 2015, and June 2, 2015.

161.    PáTu's damages resulting from PGE's breach of good faith and fair dealing by refusing to pay the Contract Rate for deliveries PGE deemed to be "Excess Energy" include through the date of this complaint: (i) PGE's refusal to pay Contract Rates for PáTu's unscheduled net output totaling an estimated amount of $182,965.60 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $46,559.83 through the date of this complaint; (ii) reduced payment to PáTu by PGE for deliveries deemed to "Excess Energy" at an estimated amount of $1,214,741.94 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $256,594.93 through the date of this complaint; and (iii) payment by PáTu to BPA for BPA engineering studies on or about September 14, 2010, to implement the rejected dynamic scheduling deliveries which total an estimated $15,000.00 plus prejudgment interest pursuant to ORS 82.010 in the estimated amount of $6,553.97 through the date of this complaint.

162.    PáTu continues to incur damages under this claim due to PGE's ongoing violations of law and is therefore entitled to damages and prejudgment interest accruing after the date of this complaint.

163.    PáTu has suffered, and is continuing to suffer, irreparable injury as a result of PGE's

Page 31 – Plaintiff's Complaint
{02859075.DOCX;1 }

refusal to accept PáTu's entire net output delivered on a kWh-basis without requiring PáTu to provide BPA integration services to PGE and refusing to pay the Contract Rate for all deliveries.

164.    Past monetary damages alone are inadequate to remedy PáTu's injuries because PGE's refusal to accept deliveries of net output and pay the Contract Rate for all deliveries is ongoing and will continue to harm PáTu's ability to receive the statutory and contractual benefits to which it is entitled over the remainder of the 20-year term of the standard PURPA contract.

165.    Considering the balance of hardships between PáTu and PGE, a remedy in equity is warranted and the public interest would not be disserved by a permanent injunction.

## VII.    DEMAND FOR JURY TRIAL

166.    Plaintiff PáTu respectfully demands a jury trial on issues triable by jury.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff PáTu prays for judgment as follows:

1.  On Plaintiff PáTu's First Claim, that the Court issue: (i) a declaratory judgment that PGE must comply with the directives of the January 22nd FERC Order and the June 18th FERC Order; (ii) a permanent injunction requiring PGE to discontinue its current practice of accepting only prescheduled MWh-block deliveries; and (iii) a permanent injunction requiring PGE to accept PáTu's entire net output in kWh, including PáTu's unscheduled net output, in each hour delivered via BPA's dynamic scheduling service without conditioning such acceptance on PáTu's payment of any charges and penalties associated with integration services.

2.  On Plaintiff PáTu's Second Claim, that judgment be awarded: (i) for PáTu's actual damages sustained in consequence of PGE's violations of law plus prejudgment interest

Page 32 – Plaintiff's Complaint

in amounts to be proven at trial, (ii) PáTu's treble damages sustained in consequence of

PGE's violations of law plus prejudgment interest in amounts to be proven at trial, and

(iii) PáTu's attorney fees.

3. On Plaintiff PáTu's Third and Fourth Claims, that the Court issue: (i) a declaratory

judgment that PGE has breached the contract and the implied covenant of good faith and

fair dealing by failing to accept deliveries from PáTu's wind generation facility; (ii) a

permanent injunction requiring PGE to discontinue its current practice of accepting only

prescheduled MWh-block deliveries; and (iii) a permanent injunction requiring PGE to

accept PáTu's entire net output in kWh, including PáTu's unscheduled net output, in each

hour delivered via BPA's dynamic scheduling service.

4. On Plaintiff PáTu's Fifth Claim, that the Court issue: (i) a declaratory judgment that PGE

has been unjustly enriched by being supplied with BPA integration services at PáTu's

expense; and (ii) a permanent injunction requiring PGE to compensate PáTu for its

expenses in supplying BPA integration services for so long as PGE's actions continue to

prevent PáTu from making deliveries without BPA integration services supplied by PáTu.

5. On Plaintiff PáTu's Sixth and Seventh Claims, that the Court issue: (i) a declaratory

judgment that PGE has breached the contract and the implied covenant of good faith and

fair dealing by failing to pay the Contract Rate for all deliveries received by the MWh-

block delivery practice; and (ii) a permanent injunction requiring PGE to pay the Contract

Rate for all deliveries received by the MWh-block delivery practice for so long as PGE's

actions prevent PáTu from delivering its entire net output in kWh, including PáTu's

unscheduled net output, in each hour delivered via BPA's dynamic scheduling service.

{02859075.DOCX;1 }

6.  On Plaintiff PáTu's Third, Fourth, Fifth, Sixth, and Seventh Claims, that judgment be awarded for PáTu's actual damages resulting from PGE's breaches plus prejudgment interest in amounts to be proven at trial.

7.  On all of Plaintiffs' Claims for Relief, for costs and post-judgment interest.

8.  Any further relief that the Court deems just and equitable.

Dated: July 22, 2015

s/ Gregory M. Adams
_____
Peter J. Richardson (OSB No. 066687)
Gregory M. Adams (OSB No. 101779)
Richardson Adams, PLLC
515 N. 27th Street
Boise, Idaho 83702
Telephone: (208) 938-2236
Fax: (208) 938-7904
peter@richardsonadams.com
greg@richardsonadams.com

John Rizzardi (OSB No. 092144)
Cairncross & Hempelmann
524 Second Ave., Ste. 500
Seattle, Washington 98104-2323
Telephone: 206-254-4444
Fax: 206-587-2308
jrizzardi@cairncross.com

Attorneys for Plaintiff PáTu Wind Farm, LLC

Page 34 – Plaintiff's Complaint
{02859075.DOCX;1 }